### McDONOUGH v. JOHNSON-WENTWORTH CO. *

Circuit Court of Appeals, Eighth Circuit.
December 14, 1928.

No. 8076.

A. C. Paul, of Minneapolis, Minn. (Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellant.

Stephen H. Philbin, of New York City (Fish, Richardson & Neave, of New York City, and Clapp, Richardson, Elmquist, Briggs & Macartney, of St. Paul, Minn., on the brief), for appellee.

Before BOOTH, Circuit Judge, and POLLOCK and DEWEY, District Judges.

BOOTH, Circuit Judge. This is a patent suit in which the complaint contains the usual allegations and prays for an injunction and an accounting. The patents involved are, United States patent No. 1,383,552, application filed September 7, 1917, patent issued July 5, 1921, to plaintiff, J. G. McDonough, for a machine for trade-marking lumber or timber; United States patent No. 1,400,223, application filed September 15, 1917, renewed May 23, 1921, patent issued December 13, 1921, to plaintiff for a lumber and timber trade-marking device. The trial court dismissed the bill. In its opinion filed it held both patents valid, but further held that the accused devices of defendant did not infringe either of the patents.

In this court appellee insists, as in the court below, that both patents are invalid, because the alleged inventions were anticipated by prior patents, and because of prior public uses; and, further, because the alleged inventions lacked patentable novelty. A further defense is noninfringement.

At the time of the issuance of plaintiff's patents in suit and for some time prior thereto, there was a demand in the trade for devices for trade-marking lumber. Plaintiff was a designer and manufacturer of sawmill machinery. He became interested in machines for trade-marking lumber as early as 1915, and filed applications for patents on machines for such purpose as early as 1916. In 1917 the applications for the patents in suit were filed. The first marker machines

designed by plaintiff for trade-marking lumber were used in connection with the trimmer machines in lumber mills. In these trimmer machines the lumber moved transversely. As early as 1916 plaintiff had in mind the designing of a marker machine which should mark the end of lumber moving longitudinally, i. e., directly toward the marking machine.

While the applications for the patents in suit were pending, and as early as 1917, plaintiff entered into correspondence with some of the officers of defendant or of its allied companies (belonging to the "Weyerhaeuser Forest Products" association) relative to a marker machine to place a trademark on the ends of lumber. This correspondence continued, and in the latter part of 1920 plaintiff disclosed to some of the officials of said allied companies his pending applications for the patents now in suit. A form of contract was also drawn up between plaintiff as licensor, and the "Weyerhaeuser Forest Products" as licensee, for the use by the licensee of rights under patents already granted to plaintiff for marking lumber, and also of rights under applications for patents pending. The execution of this contract was delayed from time to time and was never finally consummated. Meanwhile, however, plaintiff constructed a machine embodying the disclosures of his application under which patent No. 1,383,552 was later issued, and this machine was installed in January, 1921, in the plant of the Edward Rutledge Timber Company (one of the allied companies) at Cœur d'Alene, Idaho. This machine was experimental and crude, but was operative. It was too light in construction. A second machine was constructed under plaintiff's supervision and was installed at the same plant in April, 1921. It also was operative and was operated, but not to the complete satisfaction of the company. Time went on. Plaintiff secured his patents under the pending applications, but the contract with the Weyerhaeuser Forest Products was not executed.

Harry H. Payzant, superintendent of a factory of one of the allied companies, in 1920, and perhaps prior thereto, had at the request of one of the officials of his company turned his attention to machines for trademarking lumber. His first machines marked the surface of the boards. Early in 1921 he made one for marking both the surface and the end of the lumber. Only one of this type was built, and it was used about an hour. In April, 1921, Mr. Payzant developed a marker machine for trade-marking lumber on its end, which is known as the Payzant first marker or the toggle marker. Machines were manufactured in considerable numbers commencing in July, 1922. A patent covering the device—No. 1,491,735—was obtained April 22, 1924; application filed August 18, 1922.

This marking machine is claimed by plaintiff to infringe his two patents in suit.

A later marking machine, known as the second Payzant marker, was built in 1924 and went into commercial use. A patent—No. 1,592,746—was obtained on this second marker July 13, 1926; application filed July 14, 1924. This marking machine also is claimed by plaintiff to infringe his two patents in suit.

It may be noted in passing that the trial court was of the opinion that Payzant at the time he developed these two marking machines had knowledge of what plaintiff had done. We think the evidence is persuasive to that effect. This evidence, while not material on the question of infringement, was material on other issues in the case.

We turn from this outline of facts to the questions of major importance in the case.

### Are Plaintiff's Patents Valid?

Patent No. 1,383,552 states that the object of the invention was to provide for a machine, such as a planer, handling lumber by means of a longitudinal or end feed, an attachment for marking one end of the lumber passing through, the parts of the attachment being actuated by the pressure of the moving lumber. Plaintiff sought to accomplish this purpose by a device which consists of a die set in a die carrier, the latter so mounted upon a support that it may oscillate, and standing, when at rest, directly in the path of the longitudinally moving pieces of lumber as they are fed through the planer. The resistance of the die to the moving lumber is due to the weight of the parts, and also to the action of an ordinary spring door check having connection with the die carrier. The impact of the lumber against the face of the die produces the impression in the end surface of the lumber. The piece of lumber still advancing, pushes the die carrier out of its path, and the carrier then assumes a position alongside the moving piece of lumber and in sliding contact with it until the end is reached. At this point the spring door check operates in connection with the arm to which the die carrier is pivoted so as to cause the die carrier to spring back into its original position, ready for the next piece of lumber. The accompanying Figures 2, 3, and 4 of the patent drawings, together with the following excerpts from the specifications of the patent, make clear the operation:

FIG. 2

FIG. 3.

FIG. 4

"In carrying out my invention, I provide a suitable base 8 secured to a support 9 adjacent to the machine. In this base I mount an upright stud 10. A hub 11 is journaled on said stub and is provided with an arm 12 having an upright pivot pin 13 for a die carrier 14. The carrier is centrally mounted on the stud and is somewhat elongated in form and preferably provided at each end with dies 15 which are curved slightly to fit the corresponding end surfaces of the carrier. These dies may be rigidly or removably mounted on the ends of the carrier, as preferred. The hub 11 is secured to the barrel 17 of an ordinary spring door check of the type usually used for closing a door without slamming."

"When the piece of lumber or timber contacts with the die, as shown in Fig. 2, it will gradually swing it from the position shown in Fig. 2 to that illustrated in Fig. 3, where the die is indicated as having rocked entirely across the end face of the piece of lumber. During this movement the arm 12 will swing on its pivot against the resistance of the door check and as the die passes out of contact with the end face of the lumber it will swing into contact with its adjacent longitudinal edge, as indicated in Fig. 4, and slide along this edge, while the lumber continues its movement out of the machine. As soon as the pieces of lumber or timber have passed on out of the path of the arm 12, the door check will return said arm and the die carrier to their normal position, as shown in Fig. 2."

Patent No. 1,400,223, the second patent of plaintiff in suit, is a modification of the first and operates upon substantially the same principle. The main difference between the two is that in the later device the die carrier is so mounted as to swing in a vertical instead of a horizontal plane out of the way as the piece of lumber advances after making its contact with the die. The later patent also includes a weighted arm to increase the resistance of the die to the lumber in order to produce the impression. The accompanying Figures 1, 4, and 5 of the patent drawings, together with the following excerpts from the specifications, make clear the operation:

FIG. 1

FIG. 4          FIG. 5

"A die carrier 10 is centrally pivoted at 11 in the lower ends of the arms 9 and marking or branding dies 12 are mounted in the ends of the carrier 10. The oscillation of the arms 9 toward the machine is limited by means of a stop arm 13 projecting from the hub 7 and seated against a compression spring 14 that is carried by a screw 15 mounted in the bracket 6 and having its end in position to contact with the arm 13 and limit upward movement of the same. The spring 14 is positioned to yieldingly resist such upward movement. A plunger 16 is mounted to slide in a guide 17 in said bracket against the tension of a compression spring 18 and a head 19 on said plunger is positioned to bear on anti-friction rollers 20 carried by the die carrier. The effect of this engagement of the head 19 with the rollers is to position or center the die carrier properly so that a die will be in the path of the lumber or timber fed between the rolls 4 and 5. An arm 21 is mounted on the shaft 8 and provided with a rod 22 on which a weight 23 is adjustable, said weight resisting the outward movement of the arms 9 and the die carrier and normally tending to hold the arm 13 in position to compress the spring 14 and serve as a counter-balance to maintain the die carrier and die in proper position to trade-mark the lumber."

"The final position of the carrier is shown in Fig. 5, where it has almost completed its revolution, is bearing on the upper surface of the lumber, ready to drop back to its normal marking position, as shown in Fig. 1, as soon as the lumber has passed out from under it. As soon as the carrier has become clear of the lumber, the pressure of the head 19 on the rollers 20 will again position the carrier to receive the impact of the next advancing piece of lumber and apply the trade-mark or other identifying means thereto."

The inventor also states: "This die carrier may be mounted in various ways to provide for its revolution upon contact with each piece of lumber or timber that is marked and in various ways the details of construction herein shown and described may be modified and still be within the scope of my invention."

The patents of the prior art relied upon by appellee as rendering plaintiff's patents invalid are: James, No. 442,594; Riedy, No. 529,195; Doble, No. 927,225; Slick, No. 443,119; McCaffrey, No. 807,850; Mitchell, No. 1,262,626; Coleman et al., No. 1,287,887. With the exception of McCaffrey and Coleman, they were all before the Patent Office in connection with one or both of the patents of plaintiff. They were all considered by the trial court. A brief examination of them will therefore suffice.

James shows a device for marking rails or metal beams. The device is of a rotary nature and marks the rails or beams on their web as they pass over a roller under the marking stamp.

Riedy shows a device for marking lumber as it moves laterally on a trimmer machine. A marking stamp is caused to strike a blow on the end of the lumber by means of a spring.

Doble shows a device consisting of a roller die for marking the sides of cartons. As a carton moves around a circular track, it comes in contact with one arm of a bell crank lever. The lever turns, bringing the die, which is attached to the other arm, in contact with the carton.

Slick shows a device for stamping metal bars moving longitudinally. The moving bar comes in contact with the end of a lever, which causes a hammer to swing backward and upward, where it is held by a latch. Upon the latch being released the hammer falls by gravity, aided by a spring, and strikes the die carrier, forcing the die against the end of the moving bar.

McCaffrey shows a device for marking the ends of hot metal bars which are fed up to stationary dies, are marked by impact, and then removed.

Mitchell shows a device for marking the end of lumber moving longitudinally. It consists of a marking die carried on a lever arm, a latch device to retain the lever arm in a raised inoperative position, a setting and tripping member for the lever, and a positive spring tensioning means to give the necessary impact of the die upon the lumber and to retract the tripping member.

Coleman shows a trimmer marker of the roller type. It marks the end of transversely moving lumber.

Clearly no one of these prior patents anticipate either of the patents of plaintiff. The two which even approach are Slick and Mitchell. Even they are different in principle and in fundamental features. No one of these prior patents embodies, nor does the prior art disclose, the combination of basic elements shown in plaintiff's patents.

Claim 19 of the first patent of plaintiff may be taken as typical. It reads as follows:

"19. The combination, with means for feeding lumber or timber longitudinally, of an identifying device positioned in the path of the lumber to be engaged by the forward end of the lumber for marking a vertical surface thereof, the pressure of the lumber

moving said identifying device out of the path of the lumber when the marking operation is completed, said identifying device being mounted to resist sufficiently the pressure of the lumber to impress the identifying mark in the surface of the lumber."

Claim 17 of the second patent of plaintiff may be taken as typical. It reads as follows:

"17. The combination, with a planing mill lumber or timber feeding rolls, of an identifying device mounted on a horizontal axis for marking the forward surface of the lumber or timber, said identifying device being actuated through the engagement of the forward vertical surface of each piece of lumber therewith fed in abutting contact."

The basic elements of both patents are: (1) The identifying or trade-marking device; (2) the positioning of the identifying device in the path of the longitudinally moving lumber; (3) the actuating of the identifying device by the movement of the lumber; (4) the mounting of the identifying device so that its resistance to the lumber will be sufficient to make the impression on the vertical surface of the lumber, and so that the identifying device will be moved out of the path of the lumber by the pressure of the lumber after the impression is made.

These basic elements embodied in plaintiff's patents, constituted a new combination of old elements, which was at once useful and novel and has so been held by the Patent Office and by the trial court. We think that in view of the prior art, the patents are entitled to a fairly liberal construction.

[3] The fact that the two machines built under the first patent were crude and imperfect does not militate against the validity of the patent. The machines, though crude, were operative. Capacity to operate is one of the acid tests of utility as an element of invention. Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; Telephone Cases, 126 U. S. 1, 537, 8 S. Ct. 778 (31 L. Ed. 863); Electric Smelting & Aluminum Co. v. Pittsburg Reduction Co. (C. C. A.) 125 F. 926; Mergenthaler Linotype Co. v. Press Pub. Co. (C. C.) 57 F. 502.

In the Hildreth Case the court said (page 34 of 257 U. S. [42 S. Ct. 23]): "The machine patented may be imperfect in its operation; but if it embodies the generic principle, and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough."

In the Mergenthaler Case the court said (page 506 of 57 F.): "It would certainly be a novel doctrine to deny to an inventor the fruits of a broad invention because the machine which first embodied it was rudimentary in character and failed to do as good work as improved machines made subsequently. None of the great inventions could survive such a test."

In the Electric Co. Case the court said (page 933 of 125 F.): "It is rarely that an invention develops ultimate perfection in the hands of the inventor. The test of actual use discovers defects to be remedied and suggests improvements to be made. If the inventor produces a new and useful result he does not lose his reward because he, or some one else, subsequently renders it more useful."

Our conclusions on this branch of the case are that plaintiff's patents in suit are valid; that, though they are not pioneer patents in the art of marking lumber, neither are they narrow patents in a crowded art; that they should be construed with fair liberality as having substantial scope.

### Do Defendant's Machines Infringe?

The two accused machines were constructed substantially in accordance with the teachings of the Payzant patents No. 1,491,735 and No. 1,592,746, respectively. We may therefore refer to those patents in discussing the machines.

In the specifications of the first patent, the first machine, known as the toggle machine, is thus described:

"The present invention is concerned with an end marking device, and employs an oscillating weighted die-carrying member and an oscillating ink-carrier, both being actuated by the movement of the advancing material to be marked, which, in this instance, is a piece of lumber. The ink-carrier is normally in contact with the die carrier, and is first moved out of the way by the movement of the lumber, the die-carrier being then brought into forcible contact with the end of the lumber with sufficient resistance due to the provision of the weighted means, as to make an impression on the end of the piece of lumber.

"One of the improvements resides in a toggle connection between the weighted means and the die-carrying member, instead of a direct connecting link, as in the aforesaid application."

The operation of the machine is made clear from the following excerpt from the specifications, together with Figures 2 and 3 of the drawings:

*Fig 2.*

*Fig. 3.*

"The operation is as follows: The log of wood, moving lumber or other article to be marked advances towards the machine, first contacting with the end of trip arm 30. Figure 1. By means of arm 28 of the inking die is pulled upwards out of the path of the advancing lumber so that the latter can freely contact with the die 21. Fig. 2. By reason of toggle arms 15, 16 and their connection with the weight bar, the die is forced positively into the end of the lumber as the latter advances against the resistance of the weight, the spring 23 and of other moving parts of the machine. After the die has marked the lumber, the further movement of the lumber turns the die carrier upwards, thus causing the collapse of toggle arms and the release of the weight from pressing upon the die-carrier, which then floats freely on the lumber until the latter is clear of the machine. Fig. 3. After the lumber has passed the parts are restored to their normal positions."

The second machine and its method of operation will be gathered from the following excerpts from the specifications of the second patent, together with Figures 5 and 6 of the drawings:

Fig. 5.

Fig. 6.

"As the piece of lumber *31* advances in the direction of the arrow in Figure 1 past the surface marker, it engages the finger, *82*, swinging it to the left and retracting the inking member *75* into the housing, and leaving the freshly inked die *62* in the path of the end of the lumber.

"Sufficient resistance is provided to the movement of the carrier *59*, so that a clear imprint will be made upon the end of the lumber. The resistance member includes a weight *84* pivoted at its rear end on the shaft *17*, and having a wear plate *85* secured to its front face and provided with a lower beveled edge *86*, which is normally engaged by the end of a pawl *87* mounted on the carrier *59*. (Figs. 1, 5 and 6.) This pawl is provided with a pair of ears *88* disposed on opposite sides of the carrier *59*, and pivotally connected thereto by a pivot pin *89*, surrounded by a coiled spring *90* which normally urges the pawl into engagement with the beveled edge *86*. The weight *84* is provided with a bore *91* into which projects a stud bolt *92*, which is secured in the bottom *93* of the housing. An expansile coiled spring *94* surrounds the bolt *92*, and is seated between a shoulder *95*, formed at the lower end of the bore *91*, and a nut *96* threaded on the end of the bolt, and by means of which the tension of the spring may be adjusted. The resistance member is thus actuated by gravity and by a spring.

"As the lumber advances from the position shown in Figure 6, the die carrier *59* is swung upwardly, as shown in dotted lines, against the resistance furnished by the weight of the member *84*, and by the tension of the spring *94*. As the carrier *59* and weight *84* continue to swing upwardly in opposite directions about their axes, the pawl *87* rides from beneath the wear plate *85* and permits the weight *84* to drop back to its normal position, while the lower ends *72* of the arms *65* ride along the upper surface of the lumber, as shown in Figure 5. In this manner, the die *62* is disengaged from the end of the lumber without smearing, and is held out of contact with the lumber until the latter passes out of the machine. The carrier *59* then drops back to its original position, the spring *90* yielding sufficiently to permit the pawl to pass the wear plate *85*, and again become engaged with the beveled edge *86*.

"By using the weight *84* and the pressure spring *94*, a simple arrangement is provided for impressing the die *62* against the lumber, which is easy in its action, and is capable of precise adjustment."

### Tests of Infringement.

In Burr v. Duryee, 1 Wall. 531, pages 572, 573 (17 L. Ed. 650), the court said, quoting from Curtis on Patents: "Now, 'an infringement involves substantial identity, whether that identity be described by the terms "same principle," same "modus operandi," or any other. It is a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being in substance the same thing. If the invention of the patentee be a machine, it will be infringed by a machine which incorporates in its structure and operation the substance of the invention; that is, by an arrangement of mechanism which performs the same service or produces the same effect in the same way, or substantially the same way.' "

In Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, at page 125 (24 L. Ed. 935), the court said:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

"Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained."

In Electric Protection Co. v. American, etc., Co., 184 F. 916, 923, this court said: "To sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and co-operate to produce that result. If the devices are substantially different in either of these respects the charge of infringement is not sustained. [Union Paper Bag] Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Eames v. Godfrey, 1 Wall. 78, 17 L. Ed. 547; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 F. 693, 45 C. C. A. 544; Adams Electric Railway Co. v. Lindell Ry. Co., 77 F. 432, 23 C. C. A. 223. In determining the question of infringement of a patent for a combination, it is therefore necessary to look at the mode of operation or the way the device works, as well as at the result and the means by which that result is attained. Machine Co. v. Murphy, above."

See, also, Dowagiac Mfg. Co. v. Minn. Moline Plow Co., 118 F. 136 (C. C. A. 8); Diamond Power Spec. Corp. v. Bayer Co., 13 F.(2d) 337 (C. C. A. 8).

Applying the foregoing tests to the facts in the case at bar, we think it is quite clear that the result, viz., the marking of the piece of lumber on its end, is the same in defendant's accused devices as in plaintiff's disclosed machines. It seems equally clear to us that the method of operation by which the result is produced is substantially the same in defendant's accused devices as in plaintiff's disclosed machines: The die capable of oscillation is placed in the path of the longitudinally advancing lumber; the impact of the lumber against the die makes the impression on the end of the lumber; the die is so mounted and positioned that the further movement of the lumber causes the die to move out of the path of the lumber; the position taken by the die after it is out of the path of the lumber is such that when the lumber has completely passed, the die resumes its first position in front of the next piece of advancing lumber.

The third of the above-mentioned tests of infringement remains to be considered: Are the means employed by defendant's machines in their operation substantially the same as those employed in plaintiff's disclosed machines? We have already held that plaintiff's patents were not narrow patents in a crowded art, but were of substantial scope. Such being the case, plaintiff's patents are entitled to a correspondingly substantial range of equivalents. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 S. Ct. 748, 52 L. Ed. 1122; Dowagiac Mfg. Co. v. Minn. Moline Plow Co., supra; Anderson v. Collins, 122 F. 451 (C. C. A. 8); Disc Grader & Plow Co. v. Austin-

Western Road Mach. Co., 254 F. 430 (C. C. A. 8). And the particular forms of devices described in the specifications are to be considered as merely forms of devices preferred by the inventor. Continental Paper Bag Co. v. Eastern Paper Bag Co., supra; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 F. 693, 715 (C. C. A. 8); Owens Co. v. Twin City Separator Co., 168 F. 259 (C. C. A. 8). The claims of a patent, and not necessarily the description, measure the invention. Continental Paper Bag Co. v. Eastern Paper Bag Co., supra.

Applying these principles to the facts, we are of the opinion that each of the basic elements above mentioned in plaintiff's patents is present in defendant's machines, as shown by the excerpts above given from the Payzant patents, and as shown by the machines themselves. We are further of the opinion that the die carrier, the toggle arms, the spring, and the weighted arm of defendant's first machine; and the die carrier, the pawl, the weight, and the spring of defendant's second machine—are the mechanical equivalents of the die carrier, the arm, and the resistance spring disclosed in plaintiff's first patent, and also of the die carrier, the arms, the weight, and the spring disclosed in plaintiff's second patent. The functions of these several means are the same in the disclosed devices of plaintiff and in the devices of defendant. These functions are also performed in substantially the same way. The tests of mechanical equivalents are therefore fulfilled. In Union Paper Bag Machine Co. v. Murphy, supra, the court said (page 125 of 97 U. S.): "Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape. Curtis, Patents (4th Ed.) § 310." See Blake v. Robertson, 94 U. S. 728, 732 (24 L. Ed. 245). See, also, Pacific Cable Ry. Co. v. Butte City St. Ry. Co. (C. C.) 58 F. 420; Superior Skylight Co., Inc., v. August Kuhnla, Inc. (C. C. A.) 273 F. 482.

Appellee insists that there is no infringement, because the impression made by plaintiff's disclosed machines is described as made by pressure, whereas the impression made by defendant's machines is made by impact. We think there is no merit in this contention. The operation of the machines, both plaintiff's and defendant's, is the same. The impression is made by contact between the die standing at rest and the moving piece of lumber. Whether that contact shall be called pressure or impact depends upon the degree of speed at which the lumber advances against the die. There is no difference of principle involved. It may be noted in passing, though we consider it of little importance, that the term "impact" is used in the specifications of plaintiff's second patent.

It is also insisted by appellee that infringement is avoided because the die in plaintiff's device disclosed under the first patent has a rocking motion in making the impression, while in defendant's machines the die has no such motion. It is to be noted, however, that the rocking motion of the die is not an indispensable element of plaintiff's invention, as is shown by a number of the claims. If the die contains but a single letter, the impression is made by the first contact or impact. If it contains several letters or the first letter repeated, the rocking motion facilitates the making of the impression. The rocking motion may be eliminated by simply adjusting the position of the die relative to the face of the oncoming piece of lumber. Defendant's machines cannot escape infringement simply because one of their elements is capable of performing part only of the duty performed by the corresponding element in plaintiff's device. The infringement inheres in what defendant's machines do, not in what they omit to do. Hobbs v. Beach, 180 U. S. 383, 401, 21 S. Ct. 409 (45 L. Ed. 586).

It is true there are numerous differences between defendant's machines and the machines disclosed by plaintiff's patents. Some of the differences are such as to avoid infringing some of the claims of plaintiff's patents; for example, we think defendant's machines do not infringe those claims of plaintiff's patents which specifically call for a rocking movement of the die; nor those claims which specifically call for means for separating the forward moving pieces of timber from each other. Many of the differences, however, relate to form or detail, rather than to function or principle. As to such changes this court, in National Hollow B. B. Co. v. Interchangeable B. B. Co., supra, has said (page 711 of 106 F.): "Mere changes of the form of a device or of some of the mechanical elements of a combination secured by patent will not avoid infringement, where the principle or mode of operation is adopted, unless the form of the machine or of the elements changed is the distinguishing characteristic of the invention. [Columbus] Watch Co. v. Robbins, 64 F. 384, 396, 12 C. C. A. 174, 187, 22 U. S. App. 601, 634; New Departure Bell

Co. v. Bevin Bros. Mfg. Co. (C. C.) 64 F. 859." See, also, Disc Grader & Plow Co. v. Austin-Western Road Mach. Co., supra.

There are also several additions and improvements shown in defendant's machines. These, of course, do not prevent infringement. Temco Co. v. Apco Co., 275 U. S. 319, 328, 48 S. Ct. 170 (72 L. Ed. 298); Cantrell v. Wallick, 117 U. S. 689, 6 S. Ct. 910, 29 L. Ed. 1017; Wis.-Minn. Gas & Elec., etc., Co. v. Hirschy Co. (C. C. A. 8) 28 F.(2d) 838; Jonas v. Roberti (C. C. A.) 7 F.(2d) 563; Reed v. Hughes Tool Co. (C. C. A.) 261 F. 192; Smith Cannery Machines Co. v. Seattle-Astoria Iron Works (C. C. A.) 261 F. 85; Stockland v. Russell Grader Mfg. Co., 222 F. 906 (C. C. A. 8).

Our conclusion on this branch of the case is that defendant's machines infringe claims 1, 10, 14, 19, 20, 24, and 25 of United States patent No. 1,383,552; and claims 10, 17, 18, and 23 of United States patent No. 1,400,223.

The decree is reversed, with instructions for reinstatement of the case and for further proceedings not inconsistent with the views herein expressed.