**FREEMAN et al. v. ALTVATER et al.**
No. 9602.

Circuit Court of Appeals, Eighth Circuit.
July 24, 1933.

Marston Allen, of Cincinnati, Ohio (John H. Bruninga, of St. Louis, Mo., on the brief), for appellants.

Lawrence C. Kingsland, of St. Louis, Mo. (John D. Rippey. and John H. Cassidy, both of St. Louis, Mo., on the brief), for appellees.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

The appellants were plaintiffs in the court below, and the appellees defendants, and they will be so referred to in this opinion.

This suit is to compel specific performance of a license agreement under United States letters patent No. 1,681,033, issued to Benjamin W. Freeman August 14, 1928, upon an application filed December 3, 1923, for a cut-out machine for shoe uppers; to enjoin acts alleged to be in violation of that agreement; and for an accounting.

Briefly, the situation out of which the controversy arises is this: Both parties are and were designers, manufacturers, and sellers of shoe machinery. In 1922 and 1923 shoes with cut-out designs in the uppers came into vogue. There was consequently a demand for an improved method for making such designs. Shoe machines for making cut-outs in flat work were known, but a closed or completed shoe upper is not flat. Freeman in 1923 produced a machine to make cut-outs in such uppers. It was an adaptation of a Knight type press, or flat bed machine, well known in the art. The Freeman machine met with favor, and the defendants copied it in order to meet the demands of their customers. After Freeman had been granted his patent, the controversy which arose between him and the defendants over the sale by them of similar machines was settled by the license agreement which is the basis of this suit and which was entered into on January 1, 1929, between Freeman, as licensor, and the defendants, as licensees. Under this agreement the licensees were granted the right to make and sell, within a limited territory, upon payment of royalties, parts known as dies, anvils, and masks, of the patented machine, and were permitted to repair, but not to rebuild, the machines they had already sold. The licensees agreed not to sell any machines falling within the scope of the patent, not to contest its novelty or validity nor the title of the patentee, and "to co-operate in the protection of the patent" and "in the development of the business thereof and thereunder." Within a few days after the execution of this agreement, the defendants placed upon the market

a cut-out machine, known as the "Model T", designed by the defendant Altvater, president of the defendant company, for which he was granted United States letters patent No. 1,-807,952 on June 2, 1931, upon an application filed January 25, 1929.

The plaintiffs in bringing this suit charged that the Model T infringed the Freeman patent; that, moreover, its sale was in violation of the co-operation clause of the license agreement; and that the defendants had rebuilt machines which under that agreement they might only repair. The plaintiffs asked that the license agreement be specifically enforced, its violation enjoined, and the damages caused by its breach ascertained. The defendants denied that they had in any way violated the terms of the license. The suit was tried, and the court below, being of the opinion that the defendants' Model T machine did not infringe the Freeman patent, that the license agreement did not prohibit the defendants from marketing a noninfringing cut-out machine, and that no machines had been rebuilt by the defendants in violation of the license, filed findings and a decree in their favor.

The finding of the lower court that the defendants had not rebuilt machines is, we think, justified by the evidence and should not be disturbed.

It may be that the parties to the license agreement intended that the licensees should be prohibited from making or selling even any noninfringing cut-out machines, as the plaintiffs assert and as the defendants deny; but the court below thought that the written agreement failed adequately to express any such intention. In view of our conclusion upon the question of infringement, we find it unnecessary to review this issue.

The important question in this case is whether the Model T machine infringes the Freeman patent. The validity of the patent is not in question, since the defendants, being licensees, are estopped to assert its invalidity; but their contention is that the claims of the patent, as limited by the prior art, do not cover their cut-out machine. They say that they are required to accord to the patent only such novelty as is sufficient to sustain it, and that the differences between the Freeman construction and their construction are such as to avoid infringement.

In Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U. S. 342, 351, 45 S. Ct. 117, 120, 69 L. Ed. 316, the Supreme Court said with respect to such cases as this: "Of course, the state of the art cannot be used to destroy the patent and defeat the grant, because the assignor is estopped to do this. But the state of the art may be used to construe and narrow the claims of the patent, conceding their validity. The distinction may be a nice one but seems to be workable."

In Noonan v. Chester Park Athletic Club Co. (C. C. A. 6) 99 F. 90, 91, Judge Lurton, afterwards Mr. Justice Lurton, said: "The court will not assume against an assignor, and in favor of his assignee, anything more than that the invention presented a sufficient degree of utility and novelty to justify the issuance of the patent assigned, and will apply to the patent the same rule of construction, with this limitation, which would be applicable between the patentee and a stranger." This language is quoted with approval in the Westinghouse Case. See, also, Smith v. Ridgely (C. C. A. 6) 103 F. 875, 877; Bradford Belting Co. v. Kisinger-Ison Co. (C. C. A. 6) 113 F. 811, 815; Schiebel Toy & Novelty Co. v. Clark (C. C. A. 6) 217 F. 760, 764, certiorari denied 235 U. S. 707, 35 S. Ct. 283, 59 L. Ed. 434; West v. Premier Register Table Co. (C. C. A. 1) 27 F.(2d) 653, 654; Moon-Hopkins B. Mach. Co. v. Dalton Adding Mach. Co. (C. C. A. 8) 236 F. 936, 937; Leather G. & D. Co. v. Christopherson (C. C. A. 9) 182 F. 817, 822; Robeson Process Co. v. Robeson (D. C.) 293 F. 70, 74, affirmed (C. C. A. 3) 1 F.(2d) 1022.

However, in litigation such as this between a licensee and his licensor or between assignor and assignee, there is a tendency on the part of the courts to give to the patent a liberal rather than a narrow construction.

In Leader Plow Co. v. Bridgewater Plow Co. et al. (C. C. A. 4) 237 F. 376, 377, the court said: "The patents set up by the plaintiff being nothing more than improvements on the prior art, the general rule on the subject would require that they be given a narrow construction. Singer Mfg. Co. v. Cramer, 192 U. S. 265, 24 S. Ct. 291, 48 L. Ed. 437. But this general rule is elastic enough to allow the application of the dominant equitable rule that as between the assignor and assignee the construction of the patent must be broad and liberal enough to give full value to the patent assigned, and shut out the assignor from every structure within the fair meaning of the claim. When Thomas assigned the Hanger and Thomas and Hanger patents, he asserted them to be valid, and he is estopped to deny their validity. He was not estopped, however, from showing the limits of the assigned patents by evidence of the prior art, or any other relevant fact. Martin, etc., Co. v. Mar-

tin, 67 F. 786, 14 C. C. A. 642; Automatic S. Co. v. Monitor Mfg. Co. (C. C.) 180 F. 983; Noonan v. Chester Park Co., 99 F. 90, 39 C. C. A. 426; Smith v. Ridgely, 103 F. 875, 43 C. C. A. 365; Rollman v. Universal H. Works (D. C.) 207 F. 97; Standard Plunger E. Co. v. Stokes, 212 F. 941, 129 C. C. A. 461. But on an issue of infringement between assignor and assignee the courts will give a liberal rather than a narrow construction to the patent assigned, if necessary to preserve its value." See, also, Frick Co. v. Lindsay (C. C. A. 4) 27 F.(2d) 59, 63; Universal G. & L. Co. v. Haggerty (D. C.) 21 F.(2d) 544, 546; United States v. Harvey Steel Co., 196 U. S. 310, 25 S. Ct. 240, 49 L. Ed. 492; Piano Motors Corp. v. Motor Player Corp. (C. C. A. 3) 282 F. 435, 437; U. S. Frumentum Co. v. Lauhoff (C. C. A. 6) 216 F. 610, 613; Schiebel Toy & Novelty Co. v. Clark (C. C. A. 6), supra.

■ We think that it is safe to say that when a licensee, as in this case, seeks to avoid the burdens of his license by endeavoring to make a noninfringing machine, the court will give to the claims of the patent in suit as liberal an interpretation as can be justified.

It is apparent that Freeman was endeavoring to provide an efficient and economical way of performing a cut-out operation on closed and lined shoe uppers. Almost five years elapsed between his initial application for the patent and its issuance. In that time various rejections and substitutions of claims took place and several interference proceedings were had and finally settled in his favor. He was granted ninety-four claims. Eight of the more general ones are relied upon in this suit. Five of these relate to the machine as a whole and three to the parts known as the mask and die. Claim 87 appears to be typical of the former. It reads: "87. In a die press, the combination with a bed, a pressing member and a cutting-out tool supported other than by the pressing member, of a work supporting member, on said bed, adapted to fit inside of a made shoe upper provided with a work supporting surface, elevated above the bed, upon which the portion of the upper to be operated upon is positioned flatwise, and provided with a depression below the elevated surface in which another portion of the upper may be positioned by at least one hand holding the work on the work support."

The essential elements of the plaintiffs' machine are these:

1. The bed and work support, which is also referred to as the anvil. It is characterized as a "recessed elevated support", which means that hollows are present at the sides to permit the completed shoe upper to be draped over and around it, and the hand of the operator to hold the upper in place. The support is movable and slides into the working position. The movability of the work support is not a functional necessity, but is for the convenience of the operator and the facilitation of the operation.

2. The work supporting surface. This in Freeman is also movable and is adapted to fit inside of a made shoe upper. It is flattened on top where the cut-out operation takes place. It is fitted upon the anvil and is virtually a part of it.

3. The die or cutting-out tool. This is separate from the plunger or pressing member and is based upon the work support. The die in Freeman cuts from below upward upon pressure being applied to the superimposed work.

4. The plunger or pressure member. This operates from above downward and is independent of the die.

5. Backing material. This is positioned immediately behind the work to be cut, and insures complete perforation of the leather and protection for the cutting edges of the die. In Freeman this backing material consists of heavy paper on a roll, which operates across the face of the pressure member so that fresh paper is in place for each cutting operation.

6. The mask or gauge member. In Freeman this is hinged to the die support and performs the double duty of being a gauge for the cut-out work and a clamping member to hold the work in place.

7. The clutch mechanism. The purpose of this is to prevent premature operation of the plunger and consequent damage or danger. It has no part in the cutting-out operation.

In his patent Freeman made it clear that he did not restrict himself to the exact arrangement of the parts disclosed in the preferred embodiment of his invention. He says in his specifications:

"While I have necessarily shown and described the preferred embodiment of my invention somewhat in detail, it is to be understood that I may vary the size, shape, and arrangement of parts within wide limits without departing from the spirit of the invention.

"Various modifications within the scope of the invention and the appended claims will readily occur to those skilled in the art. Thus I may reverse the position of the cutters and

mount the same on the movable plunger or other pressure applying means; the plunger may be moved either from above downwardly, or from below upwardly; the entire cutting anvil, while preferably in a single unit, including the cutting instrumentalities, stripper plates, cutting and guiding masks, may, of course, be separated into co-operating or interchangeably locked parts. Also while it is an important feature of the present machine to utilize relatively heavy paper through which to perform the cutting action, it is, of course, entirely feasible to employ a soft material, such even as a sheet of brass, composition, rubber or the like suitable cutting surface. Paper is preferred because it does not dull the cutting edges of the die."

The Model T machine of Altvater was not an adaptation of the Knight type press to the work of cutting out closed shoe uppers, but was rather an adaptation to that work of what was known in the art as the Fifield Bottom Stamper. The Model T has a base or foundation piece held by a brace extending from the frame of the machine. This is surmounted by a recessed elevated work support topped by a flat work supporting surface. The work support is anvil-shaped with recesses at the front and at the sides to permit the portion of the shoe upper which is not being operated upon to drape over it. This work support is removable and can be replaced. It is not movable while the machine is in operation and does not slide into position as does the work support of Freeman. Directly above the work support is suspended by means of an overhanging arm the die support, the die, and the stripper plate, and above the die support is the plunger or pressure member. The plunger operates from above downward and is insured against premature operation by a clutch device which allows it to move only after the cutting die has made preliminary contact with the work. The die support is a turret capable of holding several dies and of being rotated so that any desired die may be placed directly below the plunger. With each die is associated a brass striking plate which serves as the backing material. Also with each die, but kept from the cutting edges thereof by a spring except when in contact with the work, is the stripper plate, which acts primarily, as the defendants claim, in stripping the work from the die after the cutting operation has been performed. That it also functions as a gauge and to some extent as a clamp we think is obvious, although denied by the defendants.

In the Model T machine the die cuts from above downward and is driven by the plunger through the work, rather than by having the work impaled upon the die by action of the plunger as in Freeman.

Each of these machines thus has a base or foundation piece to take the shock of the plunger or pressing member, a clutch mechanism to insure against premature operation, a die support disassociated from the plunger, a die, a plate called a stripper plate in the Altvater machine and a mask in the Freeman machine, backing material to insure perforation of the work and to prevent injury to the die, a work supporting surface, and a work support.

We are unable to see any functional differences in the operation of the two machines. At the time the cutting operation takes place in the Freeman machine, the completed shoe upper is draped over the anvil or work support and is held in place by the hand of the operator and by the mask which has enabled the operator to gauge the work, and the die is in contact with the work. At the time the cutting operation takes place in the Model T machine the work is draped over the work support and held in place by the hand of the operator and by the pressure of the die support which has been brought down upon it by the operator; the stripper plate and die have clamped the work to the work support, and the die is in direct contact with the work. In Freeman the die and die support is under the work, the gauge or mask is over the work, and the die cuts upward; in Altvater the die support and stripper plate are both over the work, and the die cuts downward.

In form and structure there is a difference between the two machines. Freeman places his raised work support or anvil upon the flat bed of the modified Knight type press; Altvater places his work support upon the extended arm or brace of the Fifield Bottom Stamper. Freeman increases the space between the bed and pressure member of the Knight press so as to permit the use of his raised anvil; Altvater uses the plunger of the Fifield Bottom Stamper as his pressure member, interposing between it and the work to be operated upon a die support and a die to cut downward. Had he used the Freeman method of having the die cut upward, the superimposed die support would not have been necessary. Reduced to lowest terms, each machine may be said to consist of a combination of work supporting means, clamping and gauging means, die supporting means, pressure means, and clutch operating means.

Unless the changes in the form and structure of Freeman's cut-out machine avoid in-

fringement, the defendants are infringers. While according Freeman sufficient novelty to sustain his patent, they contend that he came into an old and crowded art which so limits his claims as to leave to him virtually nothing more than the exact thing which is specifically described and illustrated in his patent. The plaintiffs claim that while the Freeman patent is not generic in the sense that it relates to a pioneer cut-out machine for anything more than closed shoe uppers, yet by combining the enlargement of the work space, a work holder of an elevated type, and a mask that performs a clamping and a gauging function, a patentable advancement in the art was made which entitled Freeman to a reasonable range of equivalents within the field which he occupied and did not limit him to the preferred embodiment of his invention.

Pertinent patents of the prior art are: George Knight patent, No. 783,403, of February 21, 1905; Gordon & Topham patent, No. 1,028,567, of June 4, 1912; Wright patent, No. 521,068, of June 5, 1894; Kemp patent, No. 573,274, of December 15, 1896; Stimpson patent, No. 180,672, of August 1, 1876; Richardson patent, No. 391,558, of October 23, 1888; and Canfield patent, No. 286,-901, of October 16, 1883. We think that, while these patents and the history of the Freeman patent in the Patent Office show that all the elements of the Freeman combination were old and well known in the art, they do not show that Freeman's combination had been anticipated or that his claims were so limited as to allow him virtually no range of equivalents. It is perhaps not important whether his invention be called a generic invention in a limited field or a specific invention. If Freeman did anything, he devised an efficient way for making cut-outs in closed shoe uppers, and it is apparent that his method was not applicable to a Knight type press alone, but that almost any form of press, stamping, or die-cutting machine could be so modified as to employ his method for making cut-outs. To limit Freeman to his own peculiar structure would be to destroy the usefulness of his patent.

■ It is generally stated that the range of equivalents to be given to a particular patent depends upon its nature and extent. If it is generic, it will be favored with a broad range of equivalents; if it is specific, the range will be correspondingly narrow. "The range of equivalents depends upon the extent and nature of the invention. If the invention is broad or primary in its character, the range of equivalents will be correspondingly broad,

under the liberal construction which the courts give to such inventions." Miller v. Eagle Mfg. Co., 151 U. S. 186, 207, 14 S. Ct. 310, 318, 38 L. Ed. 121. See, also, Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 561, 18 S. Ct. 707, 42 L. Ed. 1136; Singer Mfg. Co. v. Cramer, 192 U. S. 265, 276, 24 S. Ct. 291, 48 L. Ed. 437; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 406, 25 S. Ct. 697, 49 L. Ed. 1100; Computing Scale Co. of America v. Automatic Scale Co., 204 U. S. 609, 621, 27 S. Ct. 307, 51 L. Ed. 645; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 415, 28 S. Ct. 748, 52 L. Ed. 1122; National Hollow B.-B. Co. v. Interchangeable B.-B. Co. (C. C. A. 8) 106 F. 693, 710; Mallon v. Wm. C. Gregg & Co. (C. C. A. 8) 137 F. 68, 78; Anakin Lock Works v. Dillon Lock Works (C. C. A. 8) 292 F. 45, 47; Moslank v. Kulage (C. C. A. 8) 55 F.(2d) 835, 839; McKays Co. v. Penn Electric Switch Co. (C. C. A. 8) 60 F.(2d) 762, 766.

■ If the Freeman patent be said to be a generic patent in its limited field, it is entitled to a liberal construction. The Supreme Court, in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 328, 67 L. Ed. 523, said: "* * * We think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment. Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers, and certainly finds no reason to withhold from the really meritorious improver, the application of the rule 'ut res magis valeat quam pereat', which has been sustained in so many cases in this court."

In Hobbs v. Beach, 180 U. S. 383, 399, 21 S. Ct. 409, 416, 45 L. Ed. 586, the patent there in suit was referred to as "a pioneer in its limited field".

But if this invention of Freeman be termed nongeneric, even as a specific patent it is entitled to some range of equivalents. It is not only pioneer patents that are entitled to invoke the doctrine of equivalents. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 415, 28 S. Ct. 748, 52 L. Ed. 1122. "Any patent, however, has

some range of equivalents, unless form is made the indispensable thing. And the rule is especially applicable, where the infringer takes the whole gist of the invention, as in this case." Frick Co. v. Lindsay (C. C. A. 4) 27 F.(2d) 59, 62. See, also, Dowagiac Mfg. Co. v. Minnesota Moline Plow Co. (C. C. A. 8) 118 F. 136, 141, certiorari denied 187 U. S. 644, 23 S. Ct. 843, 47 L. Ed. 346; Moon-Hopkins Billing Machine Co. v. Dalton Adding Machine Co. (C. C. A. 8) 236 F. 936, 938; Irving-Pitt Mfg. Co. v. Blackwell-Wielandy B. & S. Co. (C. C. A. 8) 238 F. 177, 180; Knick v. Bowes "Seal Fast" Corp. (C. C. A. 8) 25 F.(2d) 442, 446; Electrol, Inc., of Mo. v. Merrell & Co. (C. C. A. 8) 39 F.(2d) 873, 878; Brown & Bigelow v. Louis F. Dow Co. (C. C. A. 8) 42 F.(2d) 785, 786; General Ry. Signal Co. v. Great Northern Ry. Co. (C. C. A. 8) 43 F.(2d) 790, 806; Skelton v. Baldwin Tool Works (C. C. A. 4) 58 F.(2d) 221, 227.

The differences which were thought by the court below to distinguish the Model T machine from the Freeman machine were these: The Model T does not possess a bed. The work support of the Freeman patent is slidably movable. The dies for the respective machines operate in opposite directions. The plaintiffs' mask is both a stripper and a gauge, while the stripper plate of the Model T performs the stripping operation only. In the Model T the die is not a part of the work support assembly. The Model T employs a brass striker instead of heavy paper backing material. The purposes of the clutch mechanisms are not the same. Each machine is capable of doing a kind of work which could not be successfully performed upon the other.

Again repeating the oft-quoted language of Union Paper Bag Machine Company v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense

of the patent law when they perform different functions or in a different way, or produce a substantially different result. * * *

"Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

See, also, Burr v. Duryee, 1 Wall. 531, 573, 17 L. Ed. 650; Cantrell v. Wallick, 117 U. S. 689, 695, 6 S. Ct. 970, 29 L. Ed. 1017; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 569, 18 S. Ct. 707, 42 L. Ed. 1136; Sanitary Refrig. Co. v. Winters, 280 U. S. 30, 41, 42, 50 S. Ct. 9, 74 L. Ed. 147; Electric Protection Co. v. American Bank Protection Co. (C. C. A. 8) 184 F. 916, 923, certiorari denied 220 U. S. 619, 31 S. Ct. 723, 55 L. Ed. 612; McDonough v. Johnson-Wentworth Co. (C. C. A. 8) 30 F.(2d) 375, 383, certiorari denied 280 U. S. 572, 50 S. Ct. 28, 74 L. Ed. 624; McKays Co. v. Penn Electric Switch Co. (C. C. A. 8) 60 F.(2d) 762, 766.

The Model T machine has a base, foundation, or bed, and if it did not have one it would be inoperative. We think that to fasten the work support of Freeman upon the bed of the Model T would not produce a noninfringing machine. The slidability of the work support performs no function in connection with the cutting operation and, as has heretofore been pointed out, merely adds to the convenience of the operator. That the dies of the respective machines operate in an opposite direction is of no consequence. See Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 126, 24 L. Ed. 935; Hobbs v. Beach, 180 U. S. 383, 21 S. Ct. 409, 45 L. Ed. 586; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; Allen v. Wingerter (C. C. A. 3) 17 F.(2d) 745.

While the stripper plate of the Model T may perform mainly a stripping function, we think that in its association with the die assembly and the die support it is essentially the equivalent of the clamping and gauging means of the Freeman machine.

Finally, the fact that each machine may be able to do some work which could not be successfully performed on the other has no bearing upon the question of actual infringement. If the ends achieved and the methods of achieving them are the same, that is sufficient. See McDonough v. Johnson-Wentworth Co. (C. C. A. 8) 30 F.(2d) 375, 384,

certiorari denied 280 U. S. 572, 50 S. Ct. 28, 74 L. Ed. 624.

The defendants urge that they are assisted by a presumption of noninfringement growing out of the issuance of the patent to Altvater on the Model T. Upon this record this question is probably of no practical importance, but our conclusion is that there is no such presumption arising from the issuance of that patent. There is a line of cases supporting or tending to support the defendants' contention in this regard. Corning & Winslow v. Burden, 15 How. 252, 271, 14 L. Ed. 683; Brammer v. Schroeder (C. C. A. 8) 106 F. 918, 928; Anderson v. Collins (C. C. A. 8) 122 F. 451, 455; Leader Plow Co. v. Bridgewater Plow Co. (C. C. A. 4) 237 F. 376, 379, 380; Gerrity v. Dallas Foundry (C. C. A. 5) 4 F.(2d) 655, 656; Ney v. Ney Mfg. Co. (C. C. A. 6) 69 F. 405, 408; National Dump Car Co. v. Ralston Steel Car Co. (C. C. A. 6) 172 F. 393, 398; J. D. Wallace & Co. v. Portable P. T. Corp. (C. C. A. 7) 51 F.(2d) 488, 489; Western Well Works, Inc., v. Layne & Bowler Corp. (C. C. A. 9) 276 F. 465, 472; Butler v. Burch Plow Co. (C. C. A. 9) 23 F.(2d) 15, 16; Griffith v. Shaw (C. C.) 89 F. 313, 316; Campbell P.-P. & Mfg. Co. v. Duplex P.-P. Co. (C. C.) 86 F. 315, 326, 327; American N. P. Co. v. Elizabeth (C. C.) 1 Fed. Cas. 708, 710, No. 312; Abbott Coin Counter Co. v. Standard-Johnson Co. (D. C.), 290 F. 418, 424, affirmed (C. C. A. 2), 296 F. 126; Beldam v. Garlock Packing Co. (D. C.) 24 F.(2d) 852, 853, reversed (C. C. A. 2) 29 F.(2d) 673, 676; Ries v. Barth Mfg. Co. (C. C. A. 7) 136 F. 850, 853. This is especially true where the patents were co-pending: Boyd v. Janesville Hay-Tool Co., 158 U. S. 260, 15 S. Ct. 837, 39 L. Ed. 973; Fore Electrical Mfg. Co. v. St. Louis Electrical Works (C. C. A. 8) 280 F. 49, 52, certiorari denied 260 U. S. 736, 43 S. Ct. 96, 67 L. Ed. 488; Majestic Electric Appliance Co. v. Hicks (C. C. A. 9) 24 F.(2d) 165, 166; Chester N. Weaver, Inc., v. American Chain Co. (C. C. A. 9) 9 F.(2d) 372, 381, 382, certiorari denied 273 U. S. 699, 47 S. Ct. 94, 71 L. Ed. 847; Hartford Empire Co. v. Obear Nester Glass Co. (D. C.) 51 F.(2d) 85, 97, 98.

In spite of these decisions, we think that the correct rule is that the issuance of the patent to Altvater merely raised a presumption of the existence of a patentable difference, and not a presumption of noninfringement. The cases which tend to support this view are: Blanchard v. Putnam, 8 Wall. 420, 425, 19 L. Ed. 433; Miller v. Eagle Mfg. Co., 151 U. S. 186, 208, 14 S. Ct. 310, 38 L. Ed. 121; Kokomo Fence Machine Co. v. Kitsel-man, 189 U. S. 8, 23, 23 S. Ct. 521, 47 L. Ed. 689; Wisconsin-Minnesota G. & E. H. A. Co. v. Hirschy Co. (C. C. A. 8) 28 F.(2d) 838, 846; Herman v. Youngstown Car Mfg. Co. (C. C. A. 6) 191 F. 579, 584, 585, 586; Murray v. Detroit Wire Spring Co. (C. C. A. 6) 206 F. 465, 467; J. F. Rowley Co. v. Columbus Pharmacal Co. (C. C. A. 6) 220 F. 127, 137; General Electric Co. v. Electric C. & M. Co. (C. C. A. 6) 243 F. 188, 193; French v. Buckeye I. & B. Works (C. C. A. 6) 10 F. (2d) 257, 262, certiorari denied 271 U. S. 673, 46 S. Ct. 486, 70 L. Ed. 1144; Monroe Body Co. v. Herzog (C. C. A. 6) 13 F.(2d) 705, 706, 707, modified on other grounds (C. C. A.) 18 F.(2d) 578; West v. Premier Register Table Co. (C. C. A. 1) 27 F.(2d) 653, 656; Ashley v. Weeks-Numan Co. (C. C. A. 2) 220 F. 899, 903; Frick Co. v. Lindsay (C. C. A. 4) 27 F.(2d) 59, 63; Skelton v. Baldwin Tool Works (C. C. A. 4) 58 F.(2d) 221, 227; Simplex Window Co. v. Hauser Reversible Window Co. (C. C. A. 9) 248 F. 919, 920, 921; Jonas v. Roberti (C. C. A. 9) 7 F.(2d) 563, 564; Bake-Rite Mfg. Co. v. Tomlinson (C. C. A. 9) 16 F.(2d) 556, 558; Dinuba Steel Products Corp. v. Killefer Mfg. Corp. (D. C.) 56 F.(2d) 848, 850; Electric Candy Machine Co. v. Morris (C. C.) 156 F. 972, 976; Einson-Freeman Co. v. Bohnig (D. C.) 43 F.(2d) 609, 611; Edwards v. Johnston Formation Testing Corp. (D. C.) 44 F.(2d) 607, 614, affirmed (C. C. A. 5) 56 F. (2d) 49.

The leading case is perhaps Herman v. Youngstown Car Mfg. Co., supra, an opinion written by Judge Denison. He points out that a patent is not the grant of a right to make or use or sell, nor does it imply any such right, and that a very considerable portion of the patents granted are in a field covered by a former relatively generic or basic patent, and are tributary to such earlier patent and cannot be practiced unless by license thereunder; that the existence of a patentable difference does not of itself tend to negative infringement; and that patentable difference may as well be based upon infringement plus improvement as upon noninfringement. His conclusion is that the issuance of a junior patent merely creates a presumption of the existence of patentable difference.

We think that the Model T machine does the same work in substantially the same way and accomplishes substantially the same result as the Freeman invention, and that it therefore does infringe the claims of the Freeman patent.

In Allen v. Wingerter (C. C. A. 3) 17 F. (2d) 745, the plaintiff's patent covered an

apparatus for making rubber battery containers. It consisted of a ram on the head of which was a battery mold. A core was suspended from the upper frame of the machine. In operation the ram thrust the mold, containing a lump of crude rubber, against the core. To break the mold from the core, a piston extending against the ram was employed. In the defendant's device the mold was suspended from the upper frame and the core was mounted on the ram. The piston was not connected with the ram. Infringement was found to exist.

Other cases closely analogous and which tend to support the views which we have expressed are: Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 126, 24 L. Ed. 935; Hobbs v. Beach, 180 U. S. 383, 21 S. Ct. 409, 45 L. Ed. 586; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; Temco Electric Motor Co. v. Apco Mfg. Co., 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. 298; Metallic Extraction Co. v. Brown (C. C. A. 8) 104 F. 345; Kauffman Eng. Co. v. Sodemann H. & P. Co. (C. C. A. 8) 14 F.(2d) 396; McDonough v. Johnson-Wentworth Co. (C. C. A. 8) 30 F.(2d) 375, certiorari denied 280 U. S. 572, 50 S. Ct. 28, 74 L. Ed. 624; Piano Motors Corp. v. Motor Player Corp. (C. C. A. 3) 282 F. 435. See Westinghouse v. Boyden Power-Brake Co., 170 U. S. 538, 568, 569, 18 S. Ct. 707, 42 L. Ed. 1136; Leader Plow Co. v. Bridgewater Plow Co. (C. C. A. 4) 237 F. 376, 379.

The decree appealed from is reversed, and the case remanded to the court below, with directions to enter a decree in favor of the plaintiffs and for such further proceedings as are not inconsistent with this opinion.